The RANIER FUND, INC., Frontier Building, a Washington Limited Partnership, Rainier Associates-Frontier Building, a Washington Limited Partnership, and Northwest Rainier, a Washington General Partnership, Robert M. Parks, Appellants,

v.

BLOMFIELD REAL ESTATE COMPANY and John Blomfield, Appellees.

No. S–902.

Supreme Court of Alaska.

April 11, 1986.

Patrick B. Gilmore, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellants.

David T. Altenbern, Peggy A. Roston, Bankston & McCollum, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This is an appeal by The Ranier Fund, Inc. (TRF) from a jury verdict awarding John Blomfield (Blomfield) $160,000 for breach of a real estate brokerage agreement. TRF challenges Judge Brian C. Shortell's denial of its motions for summary judgment, directed verdict, judgment notwithstanding the verdict, and new trial. We affirm.

## FACTS AND PROCEEDINGS

In the spring of 1982 the State of Alaska began to search for office space which would be available on short notice if the state were forced to vacate its offices in the Mackay Building. Bill Ower, a purchasing agent for the State of Alaska, contacted John Blomfield, a licensed real estate broker, regarding the search for office space for the state in Anchorage.

Among other efforts to locate space that he could present to the state, Blomfield went to the Frontier Building, where he met with TRF Vice President John Pawlus. TRF followed up on this contact with a letter dated June 25, 1982. The letter outlined TRF's policies in respect to payment of brokerage commissions. It also referred to TRF's standard form Cooperative Brokerage Agreement, which was given to Blomfield at a later date, perhaps as late as July 15.

Sometime in the first week of July, Bill Remson telephoned Blomfield to say that the state wanted to look at the Frontier Building. Remson was taking over Ower's role in the search because Ower was out of town at this time. Blomfield contacted TRF and scheduled a walk-through tour for July 15.

On July 13, Bob Link and George Elgee, the Director and Deputy Director of the Division of General Services and Supply, were visiting Anchorage from Juneau. After they finished their scheduled business, they had a couple of hours to spare before going to the airport, so they stopped by the Frontier Building. They had not planned to see the Frontier Building, and their purpose in Anchorage was not related to the Mackay Building crisis. Link testified that he was not involved in the search for new office space. Rather Bill Ower was responsible for dealing with the Mackay Building crisis.

On July 15, Blomfield met state representatives Remson, Bill Bancroft and Barry Jackson at the Frontier Building for the tour he had arranged previously.

On July 26, 1982 the state and TRF began final lease negotiations. At the outset of their meeting, TRF asked the state representatives whether Blomfield represented them. They conferred privately, then replied that he did not.[1] TRF decided at that time that it would not voluntarily pay a commission to Blomfield.

Around the time of this meeting, when Blomfield learned that the state would indeed move into the Frontier Building, he began to complete the TRF brokerage agreement. Because he did not know how much space the state would be leasing, he did not fill in the blank that asked for the total commission due. He asserts that he

1. The state would have had to pay more rent if a commission were involved, because TRF would have passed the amount of the commission on to the state as an additional cost.

tried about 30 times to reach TRF representatives to find out how much space the state was leasing, but that his calls were not returned. He apparently did not ask the state for the information.

Blomfield sued TRF to collect a real estate commission. Judge Shortell denied cross motions for summary judgment. After trial, the jury awarded Blomfield $160,000 in damages. Judge Shortell denied TRF's motion for judgment notwithstanding the verdict or for a new trial. This appeal followed.

## DISCUSSION

### I. DID THE DOCUMENTS IN THIS CASE SATISFY THE STATUTE OF FRAUDS?

In ruling on a motion for summary judgment, the court must determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Moore v. State*, 553 P.2d 8, 15 (Alaska 1976).

Here, there were numerous factual disputes, including what significance attached to the July 13 tour of the Frontier Building by Link and Elgee and whether Blomfield was acting as a representative for the state.

TRF's motion for summary judgment thus turns on whether it was entitled to judgment as a matter of law.

The brokerage agreement in this case is subject to the requirements of the statute of frauds.[2] The documents which comprise the memorandum of the commission agreement are the June 25, 1982 letter to Blomfield from TRF, and the brokerage agreement to which the letter refers.

TRF argues that the documents fail to satisfy the statute of frauds because: (1) they do not contain a description sufficient for identification; and (2) they do not state the amount of commission.

### A. Do the Documents Sufficiently Describe the Space to be Leased?

■ TRF argues that since neither the letter of June 25, 1982 nor the brokerage agreement "establish which part of a 14-floor, 250,000-square-foot building was to be leased," the space to be leased is not described sufficient for its identification. This argument is without merit.

The heading on the letter, printed in large block letters, reads "The Frontier Building." The first line of the letter states, "As the marketing program for the Frontier Building begins...." Likewise, the brokerage agreement is both headed and subscribed by a reference to the Frontier Building. There is no evidence showing that any other such building exists in Anchorage.

TRF urges us to create a hypertechnical requirement for the description of property. The purpose of the description requirement is to permit identification of the property, not to thwart the effectuation of the parties' intent.[3] According to Corbin,

if the court is convinced that no fraudulent substitution of property is being attempted and that the land actually

**2.** AS 09.25.010(a)(8) provides:
Statute of Frauds. ' (a) In the following cases and under the following conditions an agreement, promise, or undertaking is unenforceable unless it or some note or memorandum of it is in writing and subscribed by the party charged or by an agent of that party:
....
(8) an agreement authorizing or employing an agent or broker to sell or purchase real estate for compensation or commission; however, if the note or memorandum of the agreement is in writing, subscribed by the party to be charged or by a lawfully authorized agent, contains a description of the party sufficient

for identification, authorizes or employs the agent or broker named in it to sell the property, and expresses with reasonable certainty the amount of the commission or compensation to be paid the agent or broker, the agreement of authorization or employment is not unenforceable for failure to state a consideration; ...

**3.** Blomfield points out that TRF's argument "does not reflect commercial realities." If we were to require a specification of the precise footage to be leased, a lessor could avoid paying a commission simply by leasing different space within the same building.

agreed upon has been clearly established by all the evidence, including the written memorandum, the surrounding circumstances, and the oral testimony, little time should be wasted in listening to argument that the written description is inadequate.

2 A. Corbin, Corbin on Contracts § 505 at 718 (1950). *See also Fleckenstein v. Faccio*, 619 P.2d 1016, 1021 (Alaska 1980). We find the description of property sufficient in this case.

## B. Do the Documents State the Amount of Commission?

The Rainier Fund Cooperative Brokerage Agreement provides for a commission rate of $2.00 per square foot on the net rentable area and dictates the terms of payment. A blank is provided in the paragraph designating the "Total commission due."

TRF argues that since the total commission cannot be computed from information within the documents, the statute of frauds is not satisfied. Blomfield asserts that the *rate* of commission is sufficient.

Common sense militates in favor of Blomfield's position. The purpose of the statute is to provide certainty to brokers and clients, so that there will be no disputes or overreaching regarding the commission after the transaction has been completed. Designation of a rate of commission fulfills that purpose. The amount of space leased when the final negotiations are finished is an objective, easily ascertainable statistic. The total commission can be computed as soon as that information is available.

Our previous opinions do not compel a different result. In *Diggins v. Johnson*, 513 P.2d 660 (Alaska 1973), cited by TRF, we held that a brokerage listing agreement which contained no amount *or* rate of commission to be paid when the parties signed it, but into which a figure of $10,000 was inserted later, failed to comply with the statute of frauds. In this case, the rate of commission was clearly set forth at the outset of Blomfield's and TRF's dealings.

TRF itself used a different brokerage form in dealing with another local broker. That brokerage agreement did not have a space for total commission due, but rather simply stated the $2.00 per square foot rate of commission. We can safely assume that TRF would calculate the commission due under that agreement by multiplying the commission rate by the amount of space actually rented. In light of TRF's use of this alternative brokerage agreement form, its argument that the form given to Blomfield is not sufficient to satisfy the statute of frauds is not well-taken.

We believe the June 25 letter and brokerage agreement form were sufficient to satisfy AS 09.25.010(a)(8).

## II. DID BLOMFIELD ACCEPT TRF'S OFFER TO FORM A BROKERAGE CONTRACT?

TRF argues that its June 25, 1982 letter was an offer dictating the terms of acceptance. Because Blomfield did not accept the offer in the precise manner specified, TRF argues that no contract was formed.

### A. Summary Judgment.

Conflicting testimony on such issues as the significance of the July 13 visit to the Frontier Building by Elgee and Link, and who performed the introductions at the July 15 tour precludes a determination that there were no genuine issues of material fact. *Moore*, 553 P.2d at 15, n. 3.

■ While the interpretation of the words of a contract is a matter for the court, the resolution of disputes regarding the surrounding circumstances is a jury question. *A & G Construction Co. v. Reid Brothers Logging Co.*, 547 P.2d 1207, 1212 (Alaska 1976). In this case the dispute centers around whether Blomfield accepted TRF's offer *by his conduct*. The question is therefore one of the interpretation of surrounding circumstances and is not amenable to judgment as a matter of law. *Moore*, 553 P.2d at 15. We therefore affirm Judge Shortell's denial of TRF's motion for summary judgment on this issue.

### B. Directed Verdict and Judgment n.o.v.

To grant either a directed verdict or judgment n.o.v., the court must find that the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in judgment. *Alaska Children's Services, Inc. v. Smart,* 677 P.2d 899, 901 (Alaska 1984), *quoting Holiday Inns of America v. Peck,* 520 P.2d 87, 92 (Alaska 1974). If the evidence so viewed leaves room for diversity of opinion among reasonable persons, the question should be left for the jury. *Wilson v. Sibert,* 535 P.2d 1034, 1036 (Alaska 1975). This court should not weigh conflicting evidence or judge the credibility of witnesses. *Grimes v. Haslett,* 641 P.2d 813, 819 (Alaska 1982) (citations omitted).

Viewing the evidence in the light most favorable to Blomfield, we find there is room for diversity of opinion among reasonable people.

The June 25 letter and TRF's brokerage agreement form constitute an offer to form a unilateral contract, which could be accepted by performance. 1 S. Williston, Williston on Contracts § 61B, at 199 (3d ed. 1957). When the offeree begins to perform, an option contract is created. Restatement (Second) of Contracts § 45 (1979).

The jury could have believed that portion of Ower's testimony in which he said that Blomfield brought the availability of the Frontier Building to his attention before the state was otherwise aware of it. It could have decided that the July 13 visit by Link and Elgee was merely a casual encounter, having nothing to do with the Mackay Building crisis. It could have found that Blomfield performed the introductions between the TRF staff and the state representatives at the July 15 tour which Blomfield arranged at the request of the state.

These facts form a sufficient basis for finding that Blomfield fulfilled the explicit requirements of TRF's letter by physically bringing the prospective tenant to the Frontier Building, and that he satisfied the intent of the offer by establishing that he represented the state.

Once Blomfield's performance created a contract, TRF had a duty of good faith and fair dealing in its relationship with Blomfield. Restatement (Second) of Contracts § 205 (1979). Yet there is evidence to support a finding that after Blomfield had completed the part of his performance which benefited TRF, i.e., obtaining for it a tenant who ultimately leased over 119,000 square feet of space, TRF constructed impediments to his filling out of the brokerage form, and thus to his completion of performance under the contract.

Blomfield testified that TRF refused to return his calls when he attempted to determine the amount of space leased. TRF Vice President Sandelli admitted that TRF had decided not to pay Blomfield a commission even *before* the state and TRF had agreed on the amount of space to be leased, and thus before Blomfield possibly could have completed the brokerage agreement. This evidence is sufficient to find that TRF breached its duty of good faith and fair dealing. The jury could have found that Blomfield's failure to complete the ministerial task of filling out the brokerage agreement form was excused in the circumstances of this case.

### III. DID THE JURY HAVE A REASONABLE BASIS FOR AWARDING BLOMFIELD $160,000?

Based on the commission rate of $2.00 per square foot contained in TRF's brokerage agreement, the jury apparently awarded Blomfield a commission based on 80,000 square feet of leased space.

TRF contends that "Blomfield did not accept any offer at 80,000 square feet" and thus there is no evidentiary basis for the jury's award. TRF argues that the superior court therefore erred in denying its motion for a new trial.

This argument does not comport with the facts of the case. There was no "offer at 80,000 square feet" for Blomfield to accept. The offer was to pay $2.00 per square foot

leased if Blomfield brought a prospective tenant to the Frontier Building and that tenant signed a lease. The jury must have found that Blomfield accepted TRF's offer by bringing state representatives to the Frontier Building on July 15.

The question is whether the jury had a reasonable basis for awarding $160,000. *United Bonding Ins. Co. v. Castle*, 444 P.2d 454, 455 (Alaska 1968). This court must view the evidence in the light most favorable to the non-moving party. If there was an evidentiary basis for the jury's decision, we will affirm the denial of a new trial. *Bailey v. Lenord*, 625 P.2d 849, 856 (Alaska 1981).

The lease initially negotiated covered 69,-000 square feet. The state expanded the lease to 119,319 square feet shortly there-after.[4]

It is clear that the state did not initially lease 80,000 square feet, which amount is the basis for the jury's award.[5] We believe the jury could have decided that the amount initially leased was 69,000 or 119,-319 square feet. However, since the award is clearly within the range supported by the evidence, and since Blomfield does not challenge the jury's award on appeal, we will not overturn it.

We therefore AFFIRM the judgment below in all respects.

---

4. Although the record does not reveal precisely when the state expanded its lease, counsel for TRF stated at oral argument that it was "very shortly thereafter." Counsel also responded affirmatively to a question from the bench as to whether the expansion occurred "more or less contemporaneously."

5. The jury apparently focused on evidence regarding the amount of space the state anticipated needing when it began its search for office space. Blomfield testified that during his initial conversation with Ower, Ower said the state was looking for 80,000 to 100,000 square feet. State representatives Link and Elgee both testified that 80,000 feet was the space requirement the state was working with as it began seriously considering the Frontier Building, based on the number of feet the state was occupying in the Mackay Building. TRF Vice President Sandelli referred to "your requirement of 80,000 square feet" in a July 13 letter to Elgee.