SOUTHWEST MARINE, INC., d/b/a Northwest Marine, Appellant,

v.

STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, DIVISION OF ALASKA MARINE HIGHWAY SYSTEMS, Appellee.

No. S–7314.

Supreme Court of Alaska.

June 27, 1997.

Edmond W. Burke, Missoula, MT, for Appellant.

Deborah Vogt, Special Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, and Stephen L. Nourse and C. Scott Penner, Carney, Badley, Smith & Spellman, Seattle, WA, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

## I. INTRODUCTION

This appeal involves a contract pursuant to which Southwest Marine, Inc., d/b/a Northwest Marine (Northwest), was to refurbish the M/V TUSTUMENA (Tustumena), a ferry in the Alaska Marine Highway System (AMHS). Northwest asserted a number of claims against the AMHS, and the AMHS brought several counterclaims of its own. Northwest's claims were rejected in an administrative proceeding. Northwest appealed to the superior court, which denied Northwest's motions to supplement the record and for a *de novo* review of the record. The superior court also rejected Northwest's claims that (1) the AMHS breached its "duty to cooperate" and wrongfully refused to accept certain modular bathroom units that Northwest had ordered for the Tustumena and (2) the Hearing Officer in the administrative proceeding required Northwest to pay excessive liquidated damages. We affirm.

## II. *FACTS AND PROCEEDINGS*

In September 1989 the State invited bids for the refurbishment of the Tustumena. The bid invitation consisted of contract terms and detailed specifications for a variety of additions, repairs, and improvements. Within those terms and specifications were requirements for rebuilding the vessel's toilet and shower spaces and for replacing various doors.

In March 1990 the State awarded the contract to Northwest. The contract required Northwest to perform all work to the satisfaction of the State and "subject to inspection at all times and approval by any participating agency of the Government of the United States of America, and in accordance with the laws of the State of Alaska and rules and regulations of the federal agency." The contract also incorporated the specifications and requirements of the bid invitation, including those relating to the Tustumena's toilets, showers, and doors. Pursuant to those incorporated provisions, the State could reject unapproved or nonconforming work. In addition, one incorporated provision stated:

> All steel products which are to be incorporated into the work shall be produced in the United States except that minor amounts of products of foreign manufacture may be used provided the aggregate cost of such materials used does not exceed one tenth of one percent (0.1 percent) of the total contract cost, or $2,500.00, whichever is greater. [hereinafter the Buy America Provision]

Another incorporated provision required Northwest to take delivery of the Tustumena on October 18, 1990, and to redeliver the refurbished vessel by May 15, 1991. A third incorporated provision set forth liquidated damages of $10,000 "[f]or each calendar day that any work shall remain uncompleted after the completion dates specified."

On May 15, 1990, representatives of Northwest and the AMHS met so that the AMHS could review the furniture and furnishings that Northwest proposed to use in the Tustumena. At that meeting, Northwest proposed using Momek brand doors and toilet/shower modules known as "E–Mods." The AMHS expressed concerns about whether the E–Mods would be sufficiently "rugged" to meet the contract specifications and whether the Momek doors would employ hardware specified in the contract as "Best Locks." Northwest stated that "if they did use these modules, they would be customized to meet the spec which may require a fair amount of modification."

On May 24, 1990, the AMHS Project Manager Fred Ross wrote to Northwest's Greg Lind that "Momek doors and hardware are acceptable." However, he also wrote: "This letter is not an authorization to purchase, furnish or install, merely that the State agrees to the acceptability of these products. Northwest should submit a proposal for State's approval of these materials and list any cost, change or impact." Northwest concedes that it never submitted the required proposal. Nevertheless, it ordered the doors.

Throughout July 1990, Northwest and Northwest's subcontractor, Maritime Services Corporation (Maritime Services), responded to the State's concerns about the E–Mods by providing additional information about them. During these communications, Maritime Services promised to provide drawings and specifications for the State's review and approval.

On August 8, 1990, the AMHS's Ross wrote Northwest's Lind:

> Our inspection of the E–Mod Toilet Modules brochures and discussions with Mr. George Selfridge of Maritime Services Corporation indicate that the modules proposed can and will meet the M/V TUSTUMENA Refurbishment specifications.

> Based upon this premise the State of Alaska offers no objections to the installation of these modules providing they meet the intent and specifics as outline [sic] in the contract.

Based upon Ross's letter, in August 1990 Northwest issued a purchase order to Maritime Services for E–Mods.

On September 11, 1990, a few weeks after Northwest had ordered the E–Mods and Momek doors, Ross wrote Lind with concerns relating to the contract's Buy America Provision. Ross explained that a federal regula-

tion, 23 C.F.R. § 635.410, applied to the refurbishment. He also wrote:

Our recent conversation concerning the toilet modules ... [and] various doors ... indicate that these products, particularly when compiled with other yet unknowns, may well exceed those limits as set forth in [23 CFR 635.410]. Products that do not meet these requirements, do not meet the specifications, and therefore, are not in compliance with the contract.

It may be, with proper documentation, the State can request a waiver on certain products on behalf of the contractor.

The next day, Ross sent Lind another letter to "clari[fy] the statements and requirements as set forth in [23 CFR § 635.410]." He stated that the AMHS had reached the following "interpretation[ ]" of the contract: "*All* materials made of, or comprised of steel, which will be incorporated into the vessel as furnishings, appliances or equipment must be certified as U.S. manufactured steel." (Emphasis in original.)

On November 6, 1990, Northwest delivered technical drawings of the E–Mods to the State "for approval." Robert Van Slyke, an engineer advising the State, reviewed the drawings and concluded that he had "[n]o objection to installation of E–Modules based upon [the] premise [that] modules 'can and will meet the M/V TUSTUMENA Refurbishment specifications.' " However, he noted at least ten technical discrepancies between the drawings and the contract specifications. Van Slyke's comments were sent to Northwest on November 13, 1990.

The E–Mods and the Momek doors were delivered to Northwest in January 1991. The AMHS inspected the E–Mods near the end of January 1991, and Ross notified Northwest in a letter dated February 1, 1991, that the E–Mods did not meet contract specifications. Specifically, Ross wrote:

As my letter of August 8, 1990 clearly indicates, the State has never been against the Module concept of construction for toilet shower units or any other compartment construction as long as fabrication was in keeping with the specifications and intent of the contract. After inspection of the provided E–Module units for the Tustume-

na it is apparent they could have been designed and fitted with the required materials and met the contract specifications.

Ross outlined several technical deficiencies of the E–Mods, including the absence of stainless steel showers and terrazzo tile, and he asked Northwest to provide the State with "a written response detailing the corrective actions that they will take to bring the modules into compliance."

On February 7, Northwest's William Dunbar responded to Ross's February 1 letter. Dunbar disagreed with many of Ross's conclusions, and he asserted that the AMHS had waived the contract's specifications for stainless steel showers and terrazzo tile. He informed the State that Northwest would correct the alleged deficiencies but would not include terrazzo tile or stainless steel showers. In apparent response to Dunbar's letter, Ross rejected the E–Mods "for installation or use aboard the M/V Tustumena."

Around this time, according to Ross's testimony, the State first became aware that the E–Mods were made of foreign steel. On February 12, 1991, therefore, Ross reminded Northwest of the Buy America Provision and stated that the "installation of the E–Modules has not only created a possible breach of contract but has placed funding for the entire project in jeopardy."

Northwest responded in a letter dated February 26. In that letter, Northwest noted that "[t]he contract does not provide a definition of 'steel product' " and that "this term refers to structural steel members such as those which would be used in highway and bridge construction, and does not refer to any product which has steel as a component of the end product." Based upon this interpretation of "steel product," Northwest concluded that the value of the steel used to make the furnishings that it was installing in the Tustumena did not exceed the 0.1% of contract value allowance in the Buy America Provision.

In that same letter, Northwest informed the State that the Momek doors were also made of foreign steel. The next day, the State informed Northwest that it was rejecting the doors. In the rejection letter, the

State set forth six reasons for rejecting the doors, including "[u]se of steel of foreign manufacture." The other five reasons referred to technical discrepancies between the doors and the contract specifications.

On February 27, 1991, the State also wrote the Federal Highway Administration (FHWA) requesting clarification of the Buy America requirements. The FHWA replied that for purposes of the Buy America Provision, the value of the foreign steel is "the total cost of the [E–Mods] as delivered to the job site." That interpretation was confirmed by FHWA's Deputy Regional Counsel.

In a March 4, 1991, letter the State informed Northwest that it had met with FHWA officials and "continue[d] to believe the E–Mods are non-conforming because they violate the 'Buy America' provision of the contract." That same day, Northwest requested that the State "grant or obtain" a waiver of the Buy America Provision. In response thereto Ross, on March 6, wrote AMHS Facilities Supervisor Harold Moeser requesting that AMHS Contracting Officer John Halterman apply for a waiver. In his letter, Ross wrote: "Northwest Marine Inc. has assured me, and documented such assurance, that the E–Modules will comply and meet the technical issues in dispute. . . . In my opinion it is in the State's best interest to pursue a waiver."

That same day, AMHS Contracting Officer John Halterman informed Northwest that the AMHS would seek a waiver. However, the FHWA denied the request. In its decision, the FHWA relied in part upon its perception that Northwest had been aware of potential Buy America Provision problems but had ordered E–Mods manufactured with foreign steel anyway.

In April the State considered seeking a waiver for the Momek doors. However, the FHWA informed the State that it would not approve a waiver for the doors because suitable U.S.-manufactured doors were available and a waiver for the doors would not be consistent with the FHWA's decision concerning the E–Mods. Therefore, the State did not seek a waiver.

Because Northwest did not receive Buy America waivers, it was forced to remove the E–Mods and the Momek doors. As a result, the vessel was not refurbished and redelivered until eighty-five days after the completion date of May 15. Subsequently, Northwest filed eighteen separate claims, and the State asserted several counterclaims. All of Northwest's claims were denied, first by the "project engineer" and then by the "procurement officer" associated with the Tustumena refurbishment. Northwest appealed to the Commissioner of the Department of Transportation and Public Facilities. The department, in turn, appointed Avrum Gross to conduct a hearing.

During pre-hearing discovery, Northwest uncovered a March 11, 1990, internal letter from Ross to the AMHS's Harold Moeser that, Northwest alleges, demonstrates the AMHS's "secret efforts to undermine Northwest's performance." In that letter, Ross sought to "refute [Northwest's] erroneous statements" in its March 8 letter. Ross strongly opposed granting a Buy America waiver for the E–Mods and emphasized: "Not only do these materials violate the contract provisions, fail to meet the contract specifications, but clearly do not even come close to meeting the State's most basic requirements for the toilet shower construction." In addition, Ross criticized the quality of the E–Mods and stated that the AMHS specifically had told Northwest that it did not want the E–Mods during the initial May 15, 1989, meeting between the State and Northwest.

Based upon this March 11 letter, Northwest argued at the hearing that the AMHS had breached its "duty to cooperate." However, in a 370–page opinion, Hearing Officer Avrum Gross rejected Northwest's claim. The Hearing Officer also determined that Northwest failed to demonstrate that the State wrongfully rejected the E–Mods and the Momek doors. The Hearing Officer awarded the AMHS more than $1.2 million on its counterclaims, including $850,000 in liquidated damages.

On November 29, 1993, Department of Transportation and Public Facilities Deputy Commissioner Dick Chitty endorsed the

Hearing Officer's decision, and Northwest appealed to the superior court. Just after Northwest filed its initial brief, Northwest acquired a September 1994 letter, purportedly from the AMHS's Ross to Robert Kilpatrick, an employee of an affiliate of Northwest. In the letter, Ross wrote that he (1) felt Northwest "was due money on the E–Mod issue," (2) believed that "with some fixing in most cases [the E–Mods] could have been acceptable," (3) raised the Buy America Provision issue to obtain leverage so that Northwest would modify the drains and floors of the E–Mods, and (4) thought the AMHS "could have picked a more politically opportune time to deal with FHWA" if it sincerely had been interested in obtaining a waiver for the E–Mods.

In October 1994 Kilpatrick received a voice mail message from Ross that, Kilpatrick later stated, indicated that an employee grievance filed by Ross "would be helpful" to Northwest's appeal. Subsequently, Northwest obtained a copy of Ross's employee grievance, and according to Northwest, the grievance "essentially confirmed Northwest's version of the facts."

In December 1994 Northwest moved the superior court to issue *subpoenas duces tecum* to be served on Ross, his attorney, and the AMHS and to supplement the record to include Ross's 1994 letter and any relevant information obtained in response to the subpoenas. Based upon the September letter and Ross's employee grievance, Northwest also asserted that "Ross gave perjured testimony at the administrative hearing" and moved for a hearing *de novo*.

In August 1995 the superior court affirmed the hearing officer's decision and denied Northwest's motions to supplement the record and for *de novo* review. On appeal, Northwest argues that the superior court erred in denying Northwest's motions to supplement the record and to review the entire record so supplemented *de novo*. Northwest also argues that this court should reverse the superior court's decision because the AMHS (1) improperly rejected the E–Mods, (2) breached its duty to cooperate with Northwest, and (3) was not entitled to $850,000 in liquidated damages.

## III. DISCUSSION

### A. Standard of Review

■ In reviewing an agency determination, we give no deference to the superior court's decision because that court acts as an intermediate court of appeal. *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992). We interpret the words in a contract independently. *Zuelsdorf v. University of Alaska, Fairbanks,* 794 P.2d 932, 933–34 (Alaska 1990). However, "where 'interpretation of a written instrument turns on the acceptance of extrinsic evidence, the process of weighing such evidence should be for the trier of fact.'" *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 771 n. 2 (Alaska 1982); *see also Rainier Fund, Inc. v. Blomfield Real Estate Co.,* 717 P.2d 850, 853 (Alaska 1986) (concluding that whether a party accepted an offer by his conduct is a question of fact). We review the Hearing Officer's findings of fact under the substantial evidence standard. *Galt v. Stanton,* 591 P.2d 960, 962–63 (Alaska 1979).

■ Northwest's appeal also requires us to examine the superior court's decision to decline to supplement the record and review *de novo* the record so supplemented. When the superior court acts as an appellate court, it may decide to supplement the record or order a *de novo* examination of the record at its discretion. *See* Alaska R.App. P. 609(a)–(b)(1). Therefore, we review such a decision under the abuse of discretion standard.

### B. Ross's August 8, 1990, Letter

Northwest contends that the August 8, 1990, letter from the AMHS's Ross to Northwest constituted an acceptance of the E–Mods that barred the AMHS from later rejecting those units. In that letter, Ross stated:

Our inspection of the E-mod Toilet Modules brochures and discussions with Mr. George Selfridge of Maritime Services Corporation indicate that the modules proposed can and will meet the M/V TUSTUMENA Refurbishment specifications.

Based on this premise the State of Alaska offers no objections to the installation of these modules providing they meet the intent and specifics as outline [sic] in the contract.

■ "When interpreting contracts, the goal is to 'give effect to the reasonable expectations of the parties.'" *Stepanov v. Homer Elec. Ass'n*, 814 P.2d 731, 734 (Alaska 1991) (quoting *Mitford v. de Lasala*, 666 P.2d 1000, 1005 (Alaska 1983)). To accomplish this goal, we look to writings that contain the purported agreement as well as to extrinsic evidence of the parties' intent. *Id.*

■ Northwest first contends that the word "indicate" in the letter demonstrates that the State accepted the E–Mods. It correctly points out that "indicate" means "show or make known with a fair degree of certainty." *Webster's Third New International Dictionary* 1150 (1969). However, understanding the meaning of that word sheds little light on whether the letter was an acceptance because it does not address the critical interpretation issue, which is reconciling the first paragraph of the letter with the second paragraph.

■ Regardless of what the State's inspection "indicated," the first paragraph of the letter is subject to the proviso in the second paragraph. Thus, the second paragraph places a condition on the State's approval of the E–Mods because it essentially reserves the right to reject the units if they fail to conform to the intent and specifications of the contract. We have held that for a contract to be formed, it is "essential that acceptance of [an] offer be unequivocal and in exact compliance" with the terms of the offer. *Thrift Shop, Inc. v. Alaska Mut. Sav. Bank*, 398 P.2d 657, 659 (Alaska 1965). Because the second paragraph of the letter qualifies the State's approval, the letter does not satisfy the *Thrift Shop* standard. *See id.; see also Restatement (Second) of Contracts* § 59 (1979) ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different

from those offered is not an acceptance but is a counter-offer.").[1]

■ Northwest also argues that, despite the language of the August 8 letter, extrinsic evidence demonstrates that the State accepted the E–Mods. Northwest specifically refers to: (1) evidence of a "significant amount of correspondence between [the parties] concerning E–Mod details," (2) testimony by Ross that, prior to August 8, Northwest's Lind was pressuring him to approve the toilets, (3) a July 20 memo from Maritime Services' George Selfridge to Northwest in which Selfridge says that the AMHS's engineering consultant "now agrees that toilet mods 'are the way to go,'" (4) a July 24 diary entry by the AMHS's engineering consultant that says the AMHS told Northwest "to meet intent of spec," (5) a July 31 diary entry by the AMHS's engineering consultant that says Ross "found the toilet modules ... to be acceptable," and (6) an August 20 diary entry by the AMHS's engineering consultant that says the toilets were "O.K. per [Ross] ... must meet intent."

None of this evidence necessarily refutes the language of the August 8 letter. Evidence that Northwest may have been pressuring the State for approval does not mean that the State actually accepted the E–Mods. Similarly, the mere fact that information was conveyed to the State does not raise an inference that the State accepted the E–Mods.

■ We note that some of the information that Northwest provided the State specifically indicated that the proposed E–Mods did not have stainless steel shower stalls, as required by the contract. We do not conclude, however, that these communications indicate that the State waived its right to require stainless steel. Section 105–1.02 of the contract provides:

Shop drawings must be submitted for review at least 30 days in advance of intended date of fabrication.

Prior to the acceptance of these drawings any work done or materials ordered for the structures involved shall be at the Con-

---

1. Northwest also asserts that the August 8 letter is a "conditional approval." However, a qualified acceptance does not create a contractual

obligation. *Restatement (Second) of Contracts* § 59 (1979).

tractor's risk. Material ordered or work done which is not in conformance with the contract plans or accepted shop drawings will be subject to rejection.[ [2]]

Northwest concedes that on November 6, 1990, it sent the State technical drawings of the E–Mods "for approval, as required by the contract." The AMHS objected to these drawings by responding: "Specifications require stainless steel shower enclosures (proposed is painted steel)." Thus, if Northwest believed that it no longer had to use stainless steel shower stalls, Section 105–1.02 provides that it did so at its own risk.[3]

The other portions of the record to which Northwest refers (the July 20 Maritime Services memo and the diary entries) indicate, at best, that the record contains conflicting extrinsic evidence. While the July 20 memo and the diary entries suggest the AMHS accepted the E–Mods, other portions of the record support a contrary conclusion. For example, Northwest's own correspondence log summarized the August 8 letter as "[i]f E–MODS meet specs, then no objection." In addition, while Northwest cites three diary entries by the AMHS's engineering consultant, it fails to recognize a fourth entry dated December 28, 1990, in which the consultant told Dan Mahler, an engineering consultant for Northwest, that "modules have not been approved" and Mahler said "he knows—and has talked to [Northwest] about [it]."

■■■ As indicated above, when extrinsic evidence suggests conflicting inferences that bear on the interpretation of the words of a purported contract, we limit our inquiry to determining whether the trier of fact's choice

of inferences is supported by substantial evidence. *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 771 n. 2 (Alaska 1982); *Galt v. Stanton,* 591 P.2d 960, 962–63 (Alaska 1979). In this case, the Hearing Officer examined the record in detail and concluded that Northwest did not accept the E–Mods. Because this determination is supported by substantial evidence, we do not agree with Northwest that the Hearing Officer committed reversible error.

### C. The Foreign Steel Content of the E–Mods

Having concluded that the AMHS did not accept the E–Mods on August 8, we next consider whether the Hearing Officer erred in concluding that the AMHS properly rejected the E–Mods based upon those units' foreign steel content. We conclude that the Hearing Officer did not err.

#### 1. Northwest's obligation to comply with the FHWA's foreign steel regulation

■■■ The parties dispute the applicability of 23 C.F.R. § 635.410, a FHWA regulation that limits the amount of foreign steel in FHWA-funded projects. Northwest argues that it is bound to comply only with the foreign steel requirements in the contract's Buy America Provision and not with the FHWA's regulation. We disagree.

The refurbishment contract provides that "the entire construction" would be completed "subject to ... approval by any participating agency of the Government of the United States of America, and in accordance with

---

**2.** The contract requires any modification of its terms to be approved in writing by the AMHS. The record contains no evidence that the parties modified Section 105–1.02. Moreover, Northwest twice acknowledged that approval of the E–Mods would not deviate from the procedure set forth in this section. In a July 19, 1990, memo Maritime Services wrote that "[o]n receipt of a purchase order we will provide drawings and specifications for final review by all parties. During this review final changes can be made prior to production." A July 27 memo reiterated that Maritime Services would provide the State with engineering drawings of the E–Mods for comments and modifications "prior to their construction." Because these memos provide that the State could "comment on" and modify the "proposed

units prior to their construction," we disagree with Northwest's assertion that these two memos suggest that the parties agreed that Northwest would submit technical drawings only after the E–Mods were approved.

**3.** Northwest also asserts that the State waived its right to require terrazzo flooring. We disagree. A July 19, 1990, memo from the AMHS's engineering consultant to Maritime Services stated: "My understanding is Terrazzo floor coverings is no problem." Maritime Services responded: "Terrazzo ... are available as an extra item." Thus, the record suggests that the parties did not waive Northwest's obligation to provide terrazzo tile.

the laws" of such agency. General Provision § 107–1.05 further states that "[w]hen the United States Government pays all or any portion of the cost of a project, the Federal laws and rules and regulations made pursuant to such laws must be observed by the Contractor." [4]

Northwest concedes that the contract states "that federal funds were to be used on the project." Despite the plain language of the refurbishment contract, however, Northwest asserts that the contract obligated it neither to obtain the FHWA's approval of the E–Mods nor to ensure that its work conformed to the FHWA's foreign steel regulation. Northwest argues that the contract does not obligate it to comply with the FHWA's regulation because that regulation applies to the State only. Because the contract expressly requires Northwest to ensure that it completed all work in accordance with applicable federal regulations and to the complete satisfaction of relevant federal agencies, we conclude that Northwest agreed to fulfill the State's obligation to refurbish the Tustumena in conformity with state and federal law.

Northwest also asserts that it did not need to comply with the FHWA's regulation because the contract does not identify the FHWA as the funding agency. We interpret the language of the refurbishment contract and General Provision § 107–1.05 to place the burden on Northwest to identify relevant federal agencies and refurbish the Tustumena to their satisfaction.[5] Thus, we conclude that Northwest had a duty to ensure that its

work on the Tustumena complied with the FHWA's foreign steel regulation.[6]

2. *The AMHS's duty to cooperate with Northwest*

Northwest next asserts that its difficulties relating to the FHWA's foreign steel limitation arose because the AMHS breached its "duty to cooperate." Specifically, Northwest contends that the AMHS breached its duty to cooperate by failing to reject the E–Mods in a timely manner and by using "clandestine efforts" to undermine Northwest's efforts to obtain a waiver of the foreign steel regulation from the FHWA.

a. *Untimely rejection*

According to Northwest, the AMHS's February 1991 rejection constituted a breach of the AMHS's duty to cooperate because the AMHS was obliged to accept or reject the E–Mods within a reasonable time from July 27, 1990. Northwest asserts that by July 1990, it had provided the AMHS with specific information about the E–Mods' steel content and Swedish manufacture. Northwest notes, however, that prior to the AMHS's February 12, 1991, rejection letter, the AMHS's communications indicated only that the foreign steel in the E–Mods, together with steel in various ceilings, doors, joiners, and other "unknowns," "may" exceed the limits set forth in the FHWA's regulation.

Citing our decision in *Wetzler v. Wetzler*, 570 P.2d 741 (Alaska 1977), the AMHS asserts that Northwest "did not identify this as a point on appeal, and the court may not

4. The State argues that General Provision § 107–1.01 requires Northwest to comply with the FHWA's foreign steel requirement. However, that provision applies to employment regulations because it requires Northwest to "keep fully informed of all Federal ... regulations ... of bodies ... having any jurisdiction or authority, *which in any manner affect those engaged or employed on the work, or which in any way affect the conduct of the work.*" (Emphasis added.) Moreover, seven pages of detailed requirements, which accompany and explain the general provision, all regulate conditions of employment. Therefore, we conclude that this provision is not applicable to the dispute in this case.

5. Moreover, there is evidence that Northwest knew that the FHWA was "participating" in the

refurbishment. As early as the pre-bidding conference on November 6, 1989, Northwest knew that the FHWA exercised authority over the project. In that conference, the AMHS's engineering consultant informed all bidders, including Northwest, that the FHWA required any work to meet certain specifications.

6. Northwest also contends that, if the FHWA regulation applies to it, the E–Mods are not within the prohibition of the regulation. This argument misses the proper focus of Northwest's appeal because it is tantamount to arguing that the FHWA misapplied its own regulation when it determined that the E–Mods violated the regulatory foreign steel limitations. If Northwest desires to challenge the FHWA's application of the foreign steel regulation, it must sue the FHWA.

consider it now." *Wetzler* holds that "we will not treat issues that were argued in [a party's] brief but not set forth" in the party's points raised on appeal from the superior court's decision. *Wetzler*, 570 P.2d at 742 n. 2. In this case, Northwest's points on appeal state:

> The Hearing Officer and Superior Court Judge both erred by failing to consider whether AMHS breached its duty to cooperate with Northwest Marine by waiting until February 1991—some ... months after they were initially proposed—before rejecting the E–Modules.

Therefore, we will consider Northwest's argument.

■ Turning to the merits of Northwest's claim, the duty to which Northwest refers is implied in any contract. Arthur L. Corbin, 3 *Corbin on Contracts* § 571, at 349 (1960). "[I]f the right of one party to compensation is conditional upon the rendition of some service or other performance by him or on his behalf, it is nearly always a breach of contract for the other party to act so as to prevent or to hinder and delay or to make more expensive the performance of the condition." *Id.; accord* Walter H.E. Jaeger, 11 *Williston on Contracts,* § 1296 (3d. ed.1968); *see Cahoon v. Cahoon,* 641 P.2d 140, 144 (Utah 1982) ("One party cannot by willful act or omission make it impossible or difficult for the other to perform and then invoke the other's nonperformance as a defense.").

■ The State argues that the AMHS did not breach its duty to cooperate because "Ross was not aware there was foreign steel involved·until after the E–Mods were actually delivered to the ship." This assertion appears to be based in part upon the Hearing Officer's conclusion that Northwest "never notified the State foreign steel had been used in the modules." However, neither the Hearing Officer nor the State square their conclusions with the substance of Ross's September 11, 1990, letter, which provides in part:

> Our recent conversation concerning the toilet modules, dampa ceilings, various doors, and joiner materials indicate [sic] that these products, particularly when compiled with other yet unknowns, may

well exceed those limits as set forth in [the FHWA's foreign steel regulation].

This letter indicates that the AMHS was concerned with whether the foreign steel content of several products, including the E–Mods, exceeded the FHWA's foreign steel limits. Thus, it establishes that as early as September 11, 1990, the AMHS knew that the E–Mods contained some amount of foreign steel.

However, regardless of when the AMHS knew about the E–Mods' foreign steel content, the record does not demonstrate that the AMHS prevented or hindered Northwest's performance by a willful act or omission. As discussed previously, the refurbishment contract obligated Northwest to perform all work subject to the FHWA's approval and in accordance with applicable FHWA regulations. Rather than taking steps to prevent Northwest's satisfaction of this obligation, the AMHS specifically brought it to Northwest's attention in the September 11, 1990, letter, when it warned Northwest about potential problems with the E–Mods. The AMHS's September 12, 1990, letter also focused on Northwest's obligation to comply with the FHWA regulation.

Moreover, it is significant that Northwest ordered the E–Mods without receiving approval from the AMHS. As mentioned earlier, the parties' communications leading up to Ross's August 8, 1990, letter were consistent with the contract's specifications in that they contemplated Northwest submitting drawings to the AMHS before the E–Mods would be approved. However, Northwest submitted the required drawings on November 6, 1990, well after it had already ordered the E–Mods. Shortly thereafter, the AMHS responded. Rather than approving the drawings, however, it pointed out several discrepancies between them and the contract's specifications. The record indicates that Northwest neither submitted revised drawings nor took any other action to address the discrepancies. Instead, Northwest allowed production and shipment of the E–Mods to occur without apparent regard for the contract's formal approval procedures.

Thus, following the AMHS's response to the drawings, the onus was on Northwest to continue to pursue approval of the E–Mods by responding to the problems identified by the AMHS. By not communicating with the AMHS about the E–Mods between November 6 and the time the E–Mods were delivered, Northwest does not appear to have given the AMHS any reason to believe that Northwest had ordered the E–Mods. Under these circumstances, the superior court did not err in concluding that the AMHS did not breach its duty to cooperate with Northwest when it rejected the E–Mods in February 1991.

### b. *Clandestine efforts*

Northwest also argues that the AMHS breached its duty to cooperate with Northwest by employing "clandestine efforts" to persuade the FHWA to decline to waive the limitations of its foreign steel regulation. It asserts that a March 11, 1991, internal draft letter by Fred Ross to his superior contained misleading and inflammatory statements about Northwest, that Ross gave the letter to the FHWA, and that the misleading statements in the letter caused the FHWA to reject the AMHS's request for a waiver of the FHWA's foreign steel requirements for the E–Mods. We conclude that Ross's alleged conduct relating to the March 11 letter does not amount to a breach of the AMHS's duty to cooperate.

Northwest presents insufficient evidence that Ross misled the FHWA into denying the waiver request. The FHWA's memorandum of its decision explained that "[t]he regulations provide two possible bases for a waiver": (1) "Steel materials/products are not produced in the United States in sufficient and reasonably available quantities which are of a satisfactory quality" and (2) "The application of Buy America provisions would be inconsistent with the public interest." The FHWA determined that the first basis did not apply "because the specifications do not require modular construction," and Northwest could build the ship's bathrooms with

sheet stainless steel, which is "readily available in the United States." Northwest argues that this basis is "specious" because it "could only have been influenced by Ross's false statements to the effect that the E–Mods were inferior products." We disagree. The FHWA's memorandum does not suggest that FHWA officials believed that the E–Mods were inferior. Moreover, the quality of the E–Mods appears unrelated to whether other, satisfactory bathrooms could be manufactured with United States steel.[7]

The FHWA also concluded that Northwest's waiver request did not fit within the public interest exception to the foreign steel regulation. The FHWA noted that "the regulation calls for consideration of cost, administrative burden, and delay." It recognized that "all of these factors exist," but it concluded that the "the costs involved ... are not sufficient to warrant a public interest finding." Furthermore, the FHWA determined that a waiver was not appropriate because Northwest "ha[d] proceeded despite clear and early reminders of the pertinent contract requirements."

Northwest offers no arguments to challenge the FHWA's conclusion relating to "the costs involved." Instead, it focuses on whether the AMHS misled the FHWA into believing that Northwest had disregarded warnings about the contract's requirements. Because the magnitude of "the costs involved" appears to form an independent basis for the FHWA's decision, the allegedly misleading statements do not appear to have harmed Northwest. Moreover, the FHWA's memorandum of decision does not on its face reflect any of the allegedly misleading information. The FHWA recognized that Northwest had been warned that it was obligated to comply with the FHWA's regulations. As we have previously noted, Ross specifically referred to this obligation in his letter dated September 11, 1990. Therefore, the Hearing Officer correctly determined that the AMHS did not breach its duty to cooperate.

Having determined that the refurbishment contract obligated Northwest to comply with

---

7. Northwest also contends that the FHWA misinterpreted the portion of its regulation that authorizes it to waive the foreign steel limitation. As

we discussed earlier, if Northwest wishes to challenge the FHWA's application of its regulation, Northwest must sue the FHWA.

the FHWA foreign steel regulation and that the AMHS did not breach its duty to cooperate, we agree with the superior court that the Hearing Officer *did not err in concluding* that the AMHS was within its contractual rights when it rejected the E–Mods and required Northwest to remove them from the Tustumena. As the Hearing Officer noted, once the FHWA determined that the E–Mods violated the foreign steel regulation, the AMHS had no choice but to prohibit Northwest from using those units aboard the Tustumena.[8]

### D. The AMHS's Duty to Cooperate and the Momek Doors

Northwest next asserts that "[t]he order to remove the Momek doors was a direct result of the AMHS's breach of the duty to cooperate with respect to the E–Mods." We interpret this to mean that Northwest's argument depends upon our concluding that the AMHS hindered, interfered with, or made more expensive Northwest's performance of the contract's requirements relating to the E–Mods. However, we have already determined that Northwest has not successfully proven such conduct by the AMHS with respect to the E–Mods. Therefore, Northwest's argument as to the Momek doors must fail.

### E. The Liquidated Damages Award

The refurbishment contract required Northwest to redeliver the Tustumena to the AMHS by May 15, 1991. However, Northwest completed the project eighty-five days late and redelivered the vessel on August 8, 1991. Therefore, pursuant to the contract's liquidated damages provision, the superior court awarded the AMHS $850,000, which amounts to $10,000 for each day that Northwest was late.

Northwest first argues that the language of the contract bars the AMHS from collecting any liquidated damages. It correctly points out that the contract expressly states that the May 15 completion date was "tentative" and would be "confirmed" in August 1990. It asserts that "the AMHS failed to confirm this date, no firm date was ever established," and consequently Northwest's performance was not late for purposes of calculating liquidated damages.

The Hearing Officer rejected Northwest's argument by reasoning that "the words of the contract, its obvious purpose and the conduct of the parties all demonstrate conclusively that May 15, 1991 was, in fact, established under the contact as the date at which redelivery of the vessel was required." We agree.

■■■ We interpret contracts so as to give effect to the reasonable expectations of the parties. *Neal & Co. v. Association of Village Council Presidents Regional Hous. Auth.*, 895 P.2d 497, 502 (Alaska 1995). We have noted that the parties' expectations may be gleaned from "extrinsic evidence, including the parties' conduct." *Id.* In this case, substantial evidence supports the Hearing Officer's conclusion that the conduct of the parties demonstrates that they agreed that May 15 was the delivery date. As the Hearing Officer pointed out, correspondence from Northwest repeatedly sought extensions from the "May 15" redelivery date. Similarly, the AMHS consistently referred to May 15 as "the contract completion date." Because the contract did not specify a particular form that confirmation of the completion date had to take, we conclude that the Hearing Officer did not err when he concluded that the parties' conduct demonstrates that May 15, 1991, was the mutually acceptable completion date.

■■■ Northwest also argues that we should reduce the liquidated damages by $150,000 because the AMHS agreed to allow Northwest to delay work while the parties

---

8. The Hearing Officer's decision suggested that the AMHS "would have been well within its rights" to reject the E–Mods based upon noncompliance with the contract's technical specifications. We agree with Northwest that this portion of the decision is *dicta*. Rather than relying on the contract's technical specifications, the Hearing Officer decided the E–Mod issue in favor of the AMHS based upon the E–Mods' foreign steel content. Because we affirm the Hearing Officer's E–Mod decision for this same reason, we need not consider Northwest's argument that "the E–Mods would have complied with the contract's technical specifications if Northwest had been permitted to install them."

awaited the FHWA's decision about whether to waive the foreign steel limitation for the E–Mods. We have held that "a party must raise an issue during the administrative proceedings to preserve the issue for appeal." *Trustees for Alaska v. State, Dep't of Natural Resources,* 865 P.2d 745, 748 (Alaska 1993). During the administrative proceedings, Northwest sought to reduce the liquidated damages it would have to pay by arguing that its late performance was attributable to four "major causes": (1) improper rejection of the E–Mods and Momek doors; (2) certain "post-contract award modifications to the ship's galley;" (3) defects in the AMHS's contract plans and contract guidance drawings; and (4) changes in the procedure for approving drawings. The Hearing Officer found that Northwest did not identify any additional sources of the delay, and on appeal, Northwest does not make any arguments to rebut this finding. Moreover, our review of the record does not indicate that Northwest argued at the administrative proceedings that it should pay reduced liquidated damages because the AMHS agreed to allow it to delay work while the FHWA reached its decision. Therefore, we conclude that Northwest did not preserve this argument for appeal.

■■■ Finally, Northwest asserts that we should reduce the liquidated damages because "Ross allowed Northwest to install the [Momek] doors from January until March 19 without formally rejecting them." We disagree. In examining Northwest's claim that the AMHS improperly rejected the Momek doors, the Hearing Officer concluded:

> [T]here is no way to determine whether the State unreasonably delayed its rejection after the doors arrived and began to be installed because there was no evidence of when precisely those events took place. The evidence on that point were vague references by Northwest witnesses that the doors arrived at the shipyard *'in January or February.'*

(Emphasis added.) Northwest does not provide record support for a more specific arrival date. Moreover, Northwest incorrectly asserts that the AMHS did not reject the Momek doors until March 19, 1991. In fact,

the AMHS rejected the doors earlier, on February 27, 1991. Under these circumstances, we agree with the Hearing Officer that there is insufficient evidence to conclude that the AMHS caused a portion of Northwest's late performance of the contract by unreasonably delaying rejection of the Momek doors. Therefore, we decline to reduce the liquidated damages award.

### F. Northwest's Motions to Supplement the Record and for De Novo Review of the Supplemented Record

In its final claim, Northwest asserts that the superior court erred when it refused (1) to supplement the record with a September 7, 1994, letter from the AMHS's Fred Ross and an employment grievance filed by Ross against the State and (2) to review *de novo* the record so supplemented. Specifically, Northwest contends that Ross's September 7 letter and employment grievance contain "numerous *written* assertions of fact that [are] patently inconsistent with his hearing testimony and the state's entire theory of the case for the first time after the hearing." (Emphasis in original.) After reviewing the substance of the letter and the grievance, however, the superior court concluded that the documents "would not change the outcome" because neither was "relevant." We conclude that the trial court did not abuse its discretion.

Alaska Rule of Appellate Procedure 609 provides that "[i]n an appeal from an administrative agency, the superior court may in its discretion grant a trial de novo in whole or in part." Alaska R.App. P. 609(b). That Rule also empowers the superior court to "make such orders as are necessary and proper to aid its appellate jurisdiction." Alaska R.App. P. 609(a). In interpreting Rule 609, we have noted that trials *de novo* on appeal are rare. *Kott v. City of Fairbanks,* 661 P.2d 177, 180 n. 1 (Alaska 1983). Nevertheless, we have voiced approval for a trial *de novo* on appeal without a supplemented record "where, for example, the administrative decision maker is tainted … but there was a proper presentation of evidence at the administrative hearing." *Id.* In reviewing former Appellate Rule 45, the pre-

decessor to Appellate Rule 609,[9] we have also determined that a superior court properly could grant a trial *de novo* with a supplemented record where faulty procedures at the administrative level may have compromised a party's right to due process. *See State v. Lundgren Pac. Constr. Co.*, 603 P.2d at 896 & n. 18.

■ To support its position, Northwest refers to several pieces of information in Ross's September 1994 letter and employee grievance. First, it relies upon a portion of the letter in which Ross wrote, "I don't believe that the E–Mods were ordered to cut corners or for any other purpose other than [Northwest] sincerely thought they were the right product for the job." This statement does not affect our analysis in Section III.B, *supra*, of the August 8, 1990, letter. Similarly, the FHWA's memorandum of its decision not to waive its foreign steel regulation does not suggest that the FHWA thought that the E–Mods were an inferior cost-cutting product. Therefore, we conclude that the superior court did not abuse its discretion when it *found that this statement would not change the outcome of this case.*

Northwest also relies upon Ross's statement that he had "always felt [Northwest] was due money on the E–Mod issue." However, Ross appears to have based his opinion that money was due solely upon his speculation that the AMHS "could have picked a more politically opportune time to deal with FHWA." Thus, the superior court did not abuse its discretion when it concluded that this statement would not change the outcome.[10]

We also reject Northwest's argument that the letter and the grievance demonstrate that the AMHS accepted the E–Mods. In the letter, Ross wrote that "with some fixing

in most cases [the E–Mods] could have been acceptable." He did not state that the AMHS had accepted the E–Mods. The grievance indicates that Ross's superior "directed· Ross to allow [Northwest] to install the [E–Mods]." However, this statement does not prove that the AMHS approved the E–Mods. As Northwest concedes, Ross's superior told Ross to let Northwest proceed because he thought Northwest could "use whatever means available to do the construction *as long as it met the specifications.*" (Emphasis added.) Because neither of these statements contradicts the substance of Ross's August 8, 1990, letter to Northwest, we decline to conclude that they evidence an abuse of discretion by the superior court.

Next, Northwest asserts that the letter demonstrates that the AMHS breached its duty to cooperate because the letter indicates that Ross raised the foreign steel issue without sincerely believing that the E–Mods exceeded the applicable foreign steel limitations. We have previously concluded that the contract obligated Northwest to ensure that the refurbishment complied with the FHWA's regulation. We also noted that the AMHS notified Northwest in September 1990 that the proposed E–Mods "may well exceed" the limitations set forth in the regulation. Ultimately, the FHWA determined that the E–Mods in fact violated the regulation, thereby jeopardizing federal funding for the project if the AMHS did not demand the E–Mods' removal. Under these circumstances, the AMHS acted within its contractual rights, regardless of its motives for raising the issue in the first place. Therefore, we conclude that the superior court did not abuse its discretion when it determined that this piece of information would not impact the outcome of this case.

---

9. Like Appellate Rule 609, former Appellate Rule 45 empowered the superior court "to make such orders as are necessary and proper to aid its appellate jurisdiction." *Compare State v. Lundgren Pac. Constr. Co.*, 603 P.2d 889, 890 n. 3 (Alaska 1979) *with* Alaska R.App. P. 609(a).

10. In a related argument, Northwest asserts that the letter proves "the E–Mods could be modified to comply with contract technical specifications." As noted earlier, the Hearing Officer stated in passing that the AMHS could have

rejected the E–Mods for failure to comply with the contract's technical specifications; he did not, however, base his decision upon these technical specifications. Because we, like the Hearing Officer, base our decision upon the E–Mods' foreign steel content (see discussion in Section III.C.1), we determine that the superior court did not abuse its discretion by concluding that this portion of the letter would not affect the outcome of this case.

Finally, Northwest contends that Ross's September 1994 letter proves that he lied about his role in the FHWA waiver process and that, therefore, the superior court should have granted its motions for a *de novo* trial with a supplemented record. To support its position, Northwest advances several arguments that are essentially identical to those discussed above in connection with its assertion that the AMHS breached its duty to cooperate by using clandestine efforts to thwart the FHWA waiver process. Specifically, Northwest asserts that Ross supplied a copy of his March 11, 1991, letter to the FHWA, that the letter contained false and misleading statements, and that the FHWA based its decision upon those statements. Indeed, the only new element to Northwest's argument is that Ross's March 11 letter was misleading because Ross did not temper his criticism of Northwest by including information similar to that in his September 1994 letter. However, this information does not change our previous conclusion that Northwest has failed to demonstrate how any allegedly misleading statements caused the FHWA to deny the waiver request for the E–Mods. Therefore, we affirm the superior court.

## IV. *CONCLUSION*

Northwest has not established that the AMHS either breached its duty to cooperate or improperly rejected the E–Mods. Moreover, we conclude that the superior court did not err in awarding the AMHS $850,000 in liquidated damages and in refusing Northwest's motions for a *de novo* trial with a supplemented record. Therefore, we AFFIRM the superior court's decision.